Please be seated. The next case this morning, case number three, is JAM Productions v. NLRB. Mr. Gilman. May it please the court, good morning. I'm Steve Gilman. I represent the appellants whom I will refer to collectively as the employer. We ask the court to direct the regional director of the NLRB to schedule an evidentiary hearing to address the employee's objection filed in response to union conduct before the election. Under the board's regulations in the case law, a party is entitled to an evidentiary hearing if that party raises substantial and material issues of fact sufficient to support a showing of objectionable conduct. The board and the union concede that neither side can offer a discretionary benefit to employees before the election. As this court stated in NLRB v. River City, that's objectionable because it smacks of vote buying. There's no dispute in this case that prior to the election, the union picked the employer's stagehands to work multiple union jobs. In our offer of proof, we outlined evidence showing. Mr. Gilman, sorry, what was the evidence JAM Productions had tending to show that it was Justin Huffman who steered union jobs to its employees in the critical period preceding the election? We did not present any evidence in our offer of proof because Mr. Huffman was hostile to us. We understood that he was the individual who was helping the union refer these individuals. We asked the regional director to interview him. We identified him in our proffer. He was hostile. The regional director not only did not interview Mr. Huffman, the record shows that the regional director didn't either request the union records, which we also identified in our offer of proof. Records which we'd asked the union to provide, which would have probably been dispositive of the entire case. Records which would have shown the number of shows that these individuals would have worked before an election was ever scheduled and the number of shows afterwards. We asked the union to produce those records as well. They refused. We asked the regional director to examine those records. In the case handling manual, which the board publishes and it provides guidance to the regional directors, he is supposed to, under 11394.1, ordinarily investigate all objections, including interviewing witnesses and examining records. He didn't do that. Well, is that true if the regional director concludes that because jobs are available to the public, you know, there would have been nothing improper about the alleged increase of hiring of potential voters preceding the election? And that is the essential issue in the case, Your Honor. The regional director found that all of these employees were eligible for union referrals. Any member of the public is eligible if they have stagehand experience. But read our objection. We never argued that they were not eligible for this work. We said in our objection they were not entitled to it. They needed to be assigned by the union for this work. There's a fundamental difference between eligibility and entitlement. They needed to be assigned this work by the union. It's a substantial benefit, again, which this court refers to as subtle vote buying when an employee in the union's discretion is provided a benefit. Prior to the period before the election that you're alleging the subtle bribery took place, had the Shaw crew ever been assigned to union work? Well, the employer, this was a regular crew at the Riviera Theater. Right. A non-union venue. Had they ever gotten jobs at union venues prior to the month or two before the election where you said there was an increase in, there was a lot of union work they got to do? Yes. Well, of course, this is information in the sole possession of the union. These are their records. We're not privy to that information. Again, we asked for that precise information, Your Honor, but we were not provided it. The regional director apparently did not request it, even though it was highly relevant. Did you uncover or offer to provide any testimony from union employees who were not chosen for work in the weeks preceding the election who themselves believed that individuals from the Shaw crew were taking work they would otherwise expect to get? What we did, Your Honor, again, because we're not privy to union records or record keeping, what we did is we pointed out this employer early in the year, well before an election was scheduled, promoted three huge shows at the United Center. This employer paid 344 stagehands, 344. The union did not select a single member of the Shaw crew for any of this work. This we know because we had the payroll for these three shows. Yet our offer of proof points out that among other shows that the Shaw crew did work during the critical period before the election was a show at the United Center. We compared what we knew about the Shaw crew working shows well before an election was forthcoming and when everyone knew an election was going to be held soon. What we showed was if you look at the comparison evidence, they weren't working shows to our knowledge at the United Center. Well, we knew they were not working these shows at the United Center earlier and they did work a show at the United Center, at the Auditorium Theater, at Northerly Island, at Soldier Field and Grand Park during the critical period. But hadn't they been fired for part of that period? Part of that period they've been fired by you. Yes, and that supports our case, Your Honor, precisely because earlier in the year when they had been fired, they would have needed to work. That's when they would have needed to work, but they didn't fill any of those 344 slots earlier in the year. During the critical period, they were back to work. They were turning down work at the Riviera Theater because they were working union jobs. That's how we know this happened. We know this happened because we were offering them work at the Riviera. They were turning it down because they were working union jobs. So this comparison creates a substantial and material issue of fact as to whether the union selected them in its discretion because an election was forthcoming. Now the offer of proof, first of all, identified these individual shows I've referred to. We've provided the performer, the date of the show, the location of the show. So we demonstrated in our offer of proof that this work was not isolated or sporadic. It was concentrated during the critical period before the election, and when the union assigned members of the show off crew for this work, that meant they were not picking regular union members or other non-union stagehands. So again, what the regional director did was he simply found that they're eligible for the work. Anyone can be assigned this work. And so it falls from that this was not a discretionary benefit because this was nothing more than business as usual. But again, that was not the objection we presented. Our objection was not about eligibility. It was about entitlement to the work. It was about the fact that they were being assigned this work by the union. And this is a substantial benefit which this court has found is a subtle form of vote buying. And then we get to the argument which I've already alluded to, which is not only did the regional director not consider whether the show off crew was entitled to this work, he failed to find out despite the fact that his case handling manual, again at 11394.1, says all objections ordinarily should be investigated and witnesses should be interviewed and records should be examined. And we gave him a roadmap to do that. We gave him the email that I had sent the union asking for the data to show the number of referrals earlier, before an election was ever scheduled or forthcoming, and the number of referrals. And again, if only the regional director had requested this information, we probably wouldn't be here because it would resolve the case. We expected this data to show that there was a spike in referrals once everyone knew an election was forthcoming. To obtain a hearing, all we needed to do was show there was a substantial and material issue of fact. Judge Bauer in NLRB versus Service American Corp said that all the employer needs to do is show a substantial and material issue, showing there's a prima facie showing of objectionable conduct. And he went out of his way to say at this stage of the proceeding, because remember, we did not have the ability to subpoena anything. We could not subpoena records from the union until a hearing was scheduled. So that was the catch 22 the employer was put in. But Judge Bauer said an employer at this stage of the proceeding doesn't have to prove his case. He doesn't have to prove his case because he hasn't had the ability to subpoena witnesses or records. The employer simply is entitled to a hearing if the employer has come forward with a substantial and material issue of fact, which we did. I see my light is on. I'd like to reserve. I'm sorry. Sure. You want to reserve the time for rebuttal? Yes, sir. Sure. Okay. Thank you. Ms. Collins. May it please the court. Good morning. My name is Valerie Collins, and I represent the National Labor Relations Board. In this case, the board applied a longstanding, judicially-approved framework in evaluating whether the company was entitled to an evidentiary hearing, and also in sustaining the four challenged ballots. Before I kind of get into the... Should we be drawing any adverse inference from the union's refusal to provide the records that JAM Productions requested? Why would it refuse to disclose its hiring practices if it had done nothing wrong in the weeks preceding the election? So to first answer your question, no. There is no adverse inference here because perhaps there would be if it were a hearing, but here this is not. We are accepting, the board accepts everything in the proffer, in the company's offer of facts as true, and there is no adverse inference. And the reason why is they don't have to. It's not on the union's side, or it's not their burden to show that what they were doing was A-okay. It's on the company. It's on the objecting party. And it's a very high burden for a reason. We start with a presumption that all board-conducted elections are presumed to be fair, and that makes sense. We presume that people mean what they say. So if an employee says yes, we are in favor of representation, or no, the board is going to presume that that employee means what they say. And thus the burden on an objecting party is very, very high. I know, but you criticized JAM Productions' evidence speculative, but what other evidence could it have provided, particularly given that you refused its request to provide any information about who worked jobs in the critical period before the election? Well, the board did not refuse that. The union simply didn't respond to its request. I'm not sure if it was an affirmative. I'm sorry to interrupt, but couldn't you have gotten that information from the union? Yes. However, it's not the board's job to make the company's case for them. It is not on the board. But this is like a catch-22. It's like a catch-22. Union doesn't have to hand it over. You don't have to hand it over. How do they make a case? I mean, I understand how deferential we're supposed to be, but there's something a little off here. I think a simple answer to your question is that they would be able to show some type of wrongdoing if they produced any evidence that was similar to the evidence that they had for the critical period. So what the company could have said is, this was unusual. We had never had this many people. If that were a fact, that is absolutely unsupported by the proffer. There is nothing, nothing in the proffer that suggests that there was an increase, that these were highly coveted, that they were super high-paying. There's absolutely nothing there to suggest that this was anything besides ordinary. And one of the things that the company wants to highlight is this difference between an entitlement and eligibility for a benefit. And I think a simple analogy would be helpful here. Essentially what they're arguing is because we don't know how the union system worked in terms of if it was automated or whatever, how much discretion they had, that's a problem. Well, guess what? So are bonuses. There's discretion in bonuses as well. I mean, if this election happened at the end of the year and a union was complaining, hey, this employer gave all of its employees a year-end bonus, and there's a problem with that. No. That's insufficient. I mean, the employer could have been giving that bonus for 20 years, and the same can be said here. They were not able to present any evidence or any fact that says that there was anything unusual about what was going on here. What is the harm in investigating? You didn't interview Huffman, correct? Well, I personally did not. No, but yes, the board did not. Your client did. The board did not. What's the harm? The harm is the precedent that it would set. If the board is required to interview based on this flimsy, factional proffer, I mean, the board would be required. That's all the regents would be doing. What more would you want from them by way of a proffer given the fact they don't have subpoena power, they have uncooperative people, they have witnesses that won't cooperate absent a subpoena, you have subpoena power, you have the ability to investigate. What more would you want from them that they haven't provided? I think a really simple thing that they could have done is simply say this was unusual. We have never had this many people turn down jobs before based on any conflict at union venues. If they had even alleged that fact, that would have been something. They didn't even do that. They said, oh, well, in these two or three shows in January in which we had fired these people, they didn't work our shows. Well, so what? One, they were fired. That doesn't show, you know, the union's referral practice. Well, they were fired from the Riviera and they were not hired for jobs at the United Center. Yes. And then right before the election, having been rehired at Riviera, a non-union shop, they end up getting jobs at the United Center in Northern Ireland and some other, I think the Auditorium Theater, which were union jobs. That certainly at least appears on its face timing-wise, timing-wise, to look suspicious enough to justify having you look at it. But there's literally nothing before that. For all we know, this was just business as usual. And under their burden to get an evidentiary hearing, there has to be some type of factual issue. So here they were able to show, yes, employees got these referrals. They got these union jobs in their critical period. Without more, that's not an issue because that in itself is not improper. There's nothing improper about giving a benefit within that critical period if it's just ordinary. The problem is if it's new or if it's different or increased, and that's where you get the implicit vote-buying issues. Here they weren't able to present any facts at all. I mean, they have this one manager who said, yes, there were all these conflicts. They have their records that say in these two or three shows in January and February, they did not work, even though they were presumably eligible. Okay, that's fine. And then they have another guy who says, again, while these people were fired, that they didn't work these shows. The rest of the proffer is pure speculation. I mean, they start with Justin Huffman saying that it was common knowledge. He was the main contact between the union. None of this is supported by any fact that they presented. You have them saying that the stagehands, that they may call all 21 of them, and they would support their theory. There's zero fact in their proffer that would suggest that. They also have the union records that they say, well, that will seal the deal. That will prove our case. There's simply no fact to infer or to suggest that that would be true. And so the critical piece that was really completely absent from this proffer is anything about any comparator. I mean, they're comparing apples and oranges. There's simply nothing there. And because they think it might be or it's a theoretical possibility, that's just simply insufficient to trigger the board a hearing. I do want to just mention really quickly, because the company mentioned in opening, the investigation issue. As we state in our brief, the standard for a region to start an investigation on election objections is almost identical to the evidentiary hearing standard. That is longstanding. I think the case we cite is from 1955, but it originated in the 40s. In the case handling manual, which is not binding, also I, until last night, I apologize, it doesn't say what they're saying it says. So the case handling manual does not say that a regional director has to ordinarily investigate these things. The section that they're citing is for when a hearing is actually held, and it says that all objections ordinarily should be considered at an evidentiary hearing, not that all objections ordinarily should be investigated. And I think it's telling that there's zero case citations for that premise. So if you're starting with kind of an underlying, and that makes sense, because otherwise regional directors would just be investigated. I mean, that would be their whole job. Anybody could throw anything against the wall and see what sticks, and then they would be required to ordinarily investigate. And that's simply insufficient to trigger an investigation, in the same way that it's insufficient to trigger an evidentiary hearing. I do want to just touch very briefly on two cases. The first one is Service America, which opposing counsel brought up. I think that a key distinction to note there is that, one, there was something in the proffer to trigger an investigation, and the investigation uncovered a conflict. So there was essentially person A saying one thing, person B saying the opposite or whatever, and the board did not hold a hearing. And what this court held is, no, that's an issue of fact. And the board should have held a hearing. Here, there's just nothing there. I mean, there's no conflict. It's undisputed that the stagehands were working union events during the critical period. That alone is insufficient, just in the same way that, oh, if an employer gives an employee an end-of-the-year bonus, that does not automatically assume that there's some kind of hidden vote-buying purpose. There has to be something more shown based in actual facts. I thought there was an offer of proof from Barad Amani that at least 13 unit of the employees who later voted in the election worked jobs at union venues during the critical period. Yes. And he knew that because of text messages where he tried to get them to work at the Riviera. They said, I can't do it. I've got this union job. They didn't say union job. I got this job at Northern Ireland or Union or United Center or the auditorium. Given the timing of that, doesn't that at least raise some suspicion to make some type of investigation appropriate? No. I'm sorry if that's an unsatisfying answer. It really doesn't. There's nothing inherently improper about using a union referral system, in the same way that there's nothing inherently improper about an employer giving a bonus. There has to be something. But if the timing is such where they didn't have union jobs when they were available and looking for work, and then all of a sudden they're rehired by the Riviera, by JAM, they have union jobs available, and they have their regular jobs available, non-union jobs, and then all of a sudden they get all this union work right before an election, that certainly looks suspicious. There's no all of a sudden, and I think that's the key point here. The fact that they turned down two or three jobs in January and February does not show that that was usual, that they never worked these union shows before, that there was a spike. Well, they didn't turn down union jobs in January and February. They didn't get offered. They didn't get them. They turned down the jobs that the company had at union venues. So that's what they're saying. That's where the comparator that they're using comes from. These two or three shows at the United Center that Stagehands turned down, that they had at union venues. I mean, there's a whole host of reasons why anyone would turn down a job. It does not automatically mean that there's something improper about the union's job referral system, and I think that is a fatal flaw. They cannot show that there was anything new or unusual or improper about these referrals at any time, let alone during the critical period. I think it would be different if they did say, hey, but this was really unusual. We've never had people have these types of conflicts before. That's why it kind of piqued their interest. No, they didn't say that. He could have easily said that, but they did not offer that, and so the board found that that was insufficient. I see that my time is running short. I wanted to touch just very briefly on the challenge ballots. I think that it's relatively straightforward. The stipulated election agreement says that the date of the election is to be determined. It also has a very clear cutoff for the eligibility. What the board did here is simply look at the unambiguous terms of the stipulated agreement, which it considers to be a contract, and apply it. If the court has no further questions, we would ask that the court enforce the board's order in full. Thank you. Thank you. You have two minutes, counsel. Thank you. The level of evidence that counsel says we must come forward with to show that there was a clear anomaly between the number of referrals prior to an election being forthcoming and during the critical period means essentially we must win the case to make our offer proof, because if there was an anomaly, then there's a violation, and we win. That is not the standard. The standard is did we provide sufficient evidence to create an issue of material fact, and we did. And the regional director, you know, I've got the case handling manual language here. It states, I believe, all objections ordinarily should be investigated, witnesses should be interviewed, and if applicable, records should be examined. But whether it's in the case handling manual or not, read the cases. The regional director routinely investigates objections raised by parties. Sometimes objections are handled strictly based upon the regional director's investigation. We came forward with evidence showing that something was definitely fishy here. We provided the regional director with a roadmap for an investigation because we were not privy to information that only the union had and would not produce, and Judge Roebner is right. This was a classic catch-22. You know, we had to come forward with a level of evidence according to the board, which we could only get if we had subpoena power to subpoena the union's records and to subpoena witnesses. One last point on the challenge ballots. There are four. Those four ballots involve employees who are hired right after a cutoff date in the stipulated election agreement. Ordinarily, they're disqualified, but this was not an ordinary situation because the very next day after the stipulated election agreement is inked, the regional director blocked proceedings. The election was delayed seven and a half months. These individuals, they have the same interest in the outcome of the election as anyone else. They worked more than some of the other voters, and under the Teakwell decision, which we discussed in our opening and reply brief, they should have been eligible to vote. Thank you. Thank you, counsel. Thanks to both counsel. And the case is taken under advisement.